LINK:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 14–07702 BRO (VBKx) | Date | April 17, 2015 |
| Title | LISA CASTILLO ET AL V. COUNTY OF LOS ANGELES ET AL | | |

| | |
|---|---|
| Present: The Honorable | BEVERLY REID O'CONNELL, United States District Judge |

| | | |
|---|---|---|
| Renee A. Fisher | Not Present | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [22]**

## I. INTRODUCTION

Pending before the Court is Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(5) for insufficient service of process and 12(b)(6) for failure to state a claim upon which relief can be granted. (Dkt. No. 22.) After considering the papers filed in support of and in opposition to the instant motion, the Court deems this matter appropriate for resolution without oral argument of counsel. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. For the following reasons, Defendants' motion is **GRANTED in part** and **DENIED in part**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the removal of two minor children from their mother's custody by the County of Los Angeles Department of Children and Family Services ("DCFS"). On October 3, 2012, Plaintiff Lisa Castillo ("Ms. Castillo") discovered her three-month old child, Moises, unresponsive and lying face down in his crib. (Compl. ¶ 22.) Ms. Castillo's brother, who was present at the home, administered CPR, and Ms. Castillo's niece, who was also at the home, called for an ambulance. (*Id.*) Within minutes, the ambulance arrived and transported Moises to a nearby hospital. (*Id.*)

### A. The DCFS' Involvement

On October 4, 2012, Defendant and DCFS social worker Rihana Acklin ("Ms. Acklin"), visited Ms. Castillo at the hospital and questioned her about Moises, her two other minor children, Plaintiffs B.U. and L.V., and her criminal background. (*Id.* ¶ 23.) Ms. Castillo disclosed her criminal background and gave Ms. Acklin the contact information for her probation officer. (*Id.*) Without informing Ms. Castillo or obtaining her consent, Ms. Acklin also interviewed B.U. and L.V. (*Id.* ¶¶ 24–25.) B.U. was thirteen years old at the time, and L.V. was three years old. (*Id.* ¶ 22.) Ms. Acklin also interviewed Ms. Castillo's other family members who were at the hospital. (*Id.* ¶ 24.)

At 11:00 p.m. that evening, while Moises was in a coma, Ms. Acklin informed Ms. Castillo that she had decided to remove B.U. and L.V. from Ms. Castillo's custody until she could determine what had caused Moises' condition. (*Id.* ¶ 26.) Ms. Acklin informed Ms. Castillo that the children's removal was necessary because she feared for their safety and needed to determine Ms. Castillo had not caused Moises' condition before returning B.U. and L.V. to her custody. (*Id.* ¶¶ 28–29.) Ms. Castillo discussed the matter with the hospital staff, including Dr. Mohammed Zuhdi ("Dr. Zuhdi"). (*Id.* ¶ 30.) The staff and Dr. Zuhdi told Ms. Castillo that they did not believe Moises showed any signs of abuse or neglect. (*Id.*) Dr. Zuhdi also informed Ms. Castillo that the staff had spoken to Ms. Acklin and told her the same. (*Id.*)[1]

When Ms. Acklin informed Ms. Castillo that B.U. and L.V. would be removed from her custody, Ms. Castillo "cried and pleaded" with her to reconsider the decision. (*Id.* ¶ 31.) Ms. Castillo also asked to speak to Ms. Acklin's supervisor about the matter, but Ms. Acklin stated that her supervisor had already recommended that the children be removed. (*Id.* ¶ 32.) Nevertheless, Ms. Acklin assured Ms. Castillo that the children would not be separated from each other, and that the children could be released to relatives after they agreed to be fingerprinted. (*Id.* ¶¶ 34–35.) Ms. Acklin also told Ms. Castillo that she would call her the next day with a court date. (*Id.* ¶ 36.) The DCFS then removed B.U. and L.V. from Ms. Castillo's custody and placed the children in temporary housing with the County of Los Angeles ("County"). (*Id.* ¶ 37.)

[1] Moises passed away on October 8, 2012. (*Id.* ¶ 55.) At some point after Moises' death, another doctor at the hospital, Dr. Joel Barron, also informed DCFS that "he had no suspicion that Moises' death was the result of willful neglect or abuse on [Ms.] Castillo's part." (*Id.* ¶ 56.)

Early in the morning of October 5, 2012, B.U. and L.V. were separated, and L.V. was placed with a foster family. (*Id.* ¶ 44.) That same day, Ms. Castillo called Ms. Acklin and asked to be reunited with her children. (*Id.* ¶ 46.) She also contacted Ms. Acklin's supervisor, Defendant Erasmo Aguilar ("Mr. Aguilar"), who informed her that the children would not be returned until the cause of Moises' condition had been determined. (*Id.* ¶ 47.) Just as Ms. Acklin had indicated the day before, Mr. Aguilar informed Ms. Castillo that the children could be placed in the custody of relatives so long as they consented to fingerprinting and a background check. (*Id.*) In response to Ms. Castillo's concerns that the process might be lengthy, Mr. Aguilar stated, "Ms. Castillo, you are nobody special and neither are your girls, what do you want me to do, call the FBI and tell them, 'hey, please hurry, Ms. Castillo wants her girls back.'" (*Id.* ¶ 48.)

Later that afternoon, police arrived at the hospital and questioned Ms. Castillo. (*Id.* ¶ 50.) Ms. Castillo consented to a search of her home. (*Id.*) After escorting Ms. Castillo to her home and searching the premises, one of the officers told Ms. Castillo that he "really [did not] know why they are doing this to you." (*Id.*)

That same day, L.V.'s paternal grandmother, Irma Villasano ("Ms. Villasano"), was granted custody of L.V. and B.U. (*Id.* ¶ 51.) Ms. Villasano had no blood relation to B.U., and B.U. felt "very upset" at being placed in her custody. (*Id.*) When Ms. Castillo called Ms. Acklin to again request she be given custody of her children, Ms. Acklin informed her that a court date had been scheduled for October 9, 2012. (*Id.* ¶ 52.) Later that evening, however, Ms. Acklin contacted Ms. Castillo to tell her that the court date had been cancelled and that a meeting between Ms. Castillo and the DCFS would be scheduled instead. (*Id.*) When Ms. Castillo asked why her court date had been cancelled, Ms. Acklin responded that it was not necessary to see a judge. (*Id.* ¶ 53.)

During this time, doctors declared Moises brain dead. (*Id.* ¶ 45.) Ms. Castillo requested that the hospital keep Moises on life support until B.U. and L.V. could see him. (*Id.* ¶ 54.) Ms. Villasano was unable to bring B.U. and L.V. to the hospital until two days later. (*Id.*) On October 8, 2012, the hospital removed Moises from life support and declared him deceased. (*Id.* ¶ 55.) According to the Complaint, B.U. and L.V. were not present at the time. (*Id.*)

On October 9, 2012, Ms. Castillo contacted Ms. Acklin to find out when the meeting with DCFS would take place. (*Id.* ¶ 57.) Ms. Acklin indicated that the date had not yet been confirmed. (*Id.*) The next day, Ms. Acklin told Ms. Castillo that she needed to take a drug test, and that the results would help determine whether B.U. and L.V. should be returned to her. (*Id.* ¶ 58.) Ms. Acklin further informed Ms. Castillo that a "team meeting" with DCFS had been scheduled for October 12, 2012. (*Id.*) Ms. Acklin denied Ms. Castillo's request to see her children before the meeting. (*Id.*)

**B. The First Team Meeting**

Ms. Castillo attended the team meeting with various members of her family, as well as her attorney, William Becker ("Mr. Becker"). (*Id.* ¶ 59.) Several DCFS employees were present for the meeting, including Ms. Acklin and Mr. Aguilar, as well as two other defendants in this matter, Defendant Lana Adrian ("Ms. Adrian") and Defendant Norma Ward ("Ms. Ward"). (*Id.*) Over Mr. Becker's objection, the DCFS representatives indicated that attorneys were not permitted to be present at team meetings and asked Mr. Becker to leave. (*Id.*)

During the team meeting, the DCFS representatives questioned Ms. Castillo about her criminal record. (*Id.* ¶ 61.) Mr. Aguilar allegedly accused Ms. Castillo of "being a drug addict" and apparently stated, "just confess and say the truth, you know you are a drug addict." (*Id.*) When Ms. Castillo asked whether the DCFS had reviewed the results of her drug test or spoken to her probation officer about her criminal background, Mr. Aguilar did not respond. (*Id.*) The DCFS representatives then informed Ms. Castillo that the agency would not decide whether to return B.U. and L.V. to her until the results of Moises' autopsy had been returned and the police department closed its criminal investigation. (*Id.* ¶ 62.) They also indicated that she would need to complete a drug program and attend parenting, domestic violence, and grief and loss classes. (*Id.*)

Ms. Villasano, who had custody of B.U. and L.V. at the time, told the DCFS that she could no longer care for the children. (*Id.* ¶ 63.) Ms. Castillo's cousin, Diana Padilla ("Ms. Padilla"), volunteered. (*Id.* ¶ 64.) The DCFS informed Ms. Castillo that she would only be permitted to see her children during supervised visitations. (*Id.* ¶ 65.) According to the Complaint, Ms. Castillo "was forced to sign a voluntary placement agreement"

"[u]nder duress and fear of losing her children forever." (*Id.* ¶ 68.) Ms. Castillo alleges that she "did not willingly sign the voluntary placement agreement." (*Id.*)

### C. Events After the First Team Meeting

After the team meeting and B.U. and L.V.'s placement with Ms. Padilla, Ms. Castillo "called DCFS repeatedly to find out when her children would be returned to her." (*Id.* ¶ 74.) She saw the children only when Ms. Padilla was available for supervised visitations. (*Id.* ¶¶ 76, 83–84.) Ms. Acklin, and later, Virginia Espinoza ("Ms. Espinoza"), who was assigned to Ms. Castillo's case in November 2012, denied Ms. Castillo's requests for unsupervised visits. (*Id.* ¶¶ 75, 83–84.) B.U. "became increasingly angrier and resentful," and L.V. "began to have temper tantrums every morning." (*Id.* ¶¶ 77, 79.)

Sometime in February 2013, a medical examiner completed Moises' autopsy report. (*Id.* ¶ 85.) The examiner informed Ms. Castillo that Moises had died from "sequel[a]e of hypoxic ischemic encephal and cardiac arrest." (*Id.*) The autopsy report, however, stated that the cause of death was "undetermined." (*Id.*) Ms. Castillo obtained a copy of the autopsy report and contacted Ms. Espinoza. (*Id.* ¶ 86.) After leaving several messages for Ms. Espinoza, Ms. Castillo visited her in person. (*Id.* ¶¶ 87–88.) Ms. Espinoza stated that she would need to review her own copy of the autopsy report and that she would request one immediately. (*Id.* ¶ 89.) Over the next several days, Ms. Castillo continued to contact Ms. Espinoza, as well as her supervisor, Defendant Christina Alfaro ("Ms. Alfaro"), to determine whether DCFS had received the autopsy report. (*Id.* ¶¶ 91–92.) They did not return her calls. (*Id.*)

### D. The Second Team Meeting and the Children's Return to Ms. Castillo

In April 2013, the police department contacted Ms. Castillo and told her that it had closed her case and found no wrongdoing on her part. (*Id.* ¶ 96.) Then on May 9, 2013, the DCFS held a second team meeting. (*Id.* ¶ 97.) Ms. Castillo attended the meeting with two family members. (*Id.*) B.U. and L.V. were also present. (*Id.*) Ms. Espinoza and Ms. Alfaro attended on behalf of DCFS. (*Id.*)

At the meeting, Ms. Castillo gave Ms. Espinoza and Ms. Alfaro proofs of completion certificates for the parenting, domestic violence, and grief and loss classes, as well as the drug program. (*Id.* ¶ 98.) Ms. Alfaro told Ms. Castillo that B.U. and L.V. would be returned to her custody. (*Id.* ¶ 99.) All together, over seven months had passed since B.U. and L.V. were first taken from Ms. Castillo's custody. (*Id.*) Following the children's return to Ms. Castillo, the children exhibited signs of trauma and distress. (*Id.* ¶¶ 104–106.) B.U. ran away from home, was hospitalized for a drug overdose, cut herself, and was suspended from school for fighting. (*Id.* ¶ 105.) L.V. refused to leave Ms. Castillo's side and feared that her mother would leave again. (*Id.* ¶ 106.)

The DCFS closed Ms. Castillo's case sometime in August 2013. (*Id.* ¶ 109.) Between May 2013 and March 2014, Ms. Castillo requested a copy of her case file on several occasions. (*Id.* ¶ 101.) Ms. Espinoza eventually informed Ms. Castillo that the agency would not release the file. (*Id.*)

### E. Procedural History

Ms. Castillo, B.U., and L.V. (collectively, "Plaintiffs") presented a claim for damages to the County on October 3, 2014. (*Id.* ¶ 121.) That same day, Plaintiffs filed a Complaint in this Court against the County, Ms. Acklin, Ms. Adrian, Mr. Aguilar, Ms. Alfaro, Ms. Espinoza, and Ms. Ward (collectively, "Defendants"). (Dkt. No. 1.) The County was served on February 6, 2015. (Dkt. No. 16.) Ms. Acklin, Mr. Aguilar, Ms. Alfaro, Ms. Espinoza, and Ms. Ward were served on February 9, 2015. (Dkt. Nos. 15, 17–20.) Plaintiffs have not yet served Ms. Adrian.

Because Plaintiffs did not file proofs of service with the Court, the Court issued an order to show cause as to why this case should not be dismissed for lack of prosecution. (Dkt. No. 14.) Shortly thereafter, on February 27, 2015, Defendants filed the instant Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6). (Dkt. No. 22.) Plaintiffs have since filed proofs of service, (Dkt. Nos. 15–20), and timely opposed the motion, (Dkt. No. 24). Defendants timely replied. (Dkt. No. 27.)

# III. LEGAL STANDARD

## A. Federal Rule of Civil Procedure 12(b)(5)

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). A party may challenge service of process under Federal Rule of Civil Procedure 12(b)(5). *See* Fed. R. Civ. P. 12(b)(5). The plaintiff bears the burden of showing proper service in compliance with Federal Rule of Civil Procedure 4. *See Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004).

Pursuant to Rule 4(m),

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). The Ninth Circuit has explained that Rule 4(m) "provides two avenues for relief." *Lemoge v. United States*, 587 F.3d 1188, 1198 (9th Cir. 2009). The first avenue is mandatory: upon a showing of good cause, a district court must extend the time for service. *Id.* The second avenue is discretionary: if the plaintiff fails to establish good cause, a district court may nevertheless extend the time for service so long as the plaintiff demonstrates at least excusable neglect. *Id.*

## B. Federal Rule of Civil Procedure 12(b)(6)

Under Rule 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be

enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief. *Id.*

Where a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."). Leave to amend, however, "is properly denied . . . if amendment would be futile." *Carrico v. City & Cnty. of S.F.*, 656 F.3d 1002, 1008 (9th Cir. 2011).

## IV. DISCUSSION

Plaintiffs bring twelve claims for relief. B.U. and L.V. each allege Fourth Amendment violations against Defendants Ms. Acklin, Ms. Adrian, Mr. Aguilar, and Ms. Ward pursuant to 42 U.S.C. § 1983. (Compl. ¶¶ 122–32.) All three Plaintiffs allege First, Sixth, and Fourteenth Amendment violations against all Defendants pursuant to § 1983. (*Id.* ¶¶ 133–52.) Plaintiffs' sixth claim is against the County for municipal liability. (*Id.* ¶¶ 153–85.) Plaintiffs' seventh claim avers that the County violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. (*Id.* ¶¶ 186–97.) Plaintiffs' eighth claim is for negligent supervision, hiring, retention, and discipline and is brought against all Defendants. (*Id.* ¶¶ 198–206.) Plaintiffs' ninth claim charges all Defendants with intentional infliction emotional distress. (*Id.* ¶¶ 207–13.) The tenth through twelfth claims allege that all Defendants violated Plaintiffs' state civil rights pursuant to California Civil Code sections 43, 52.1, 51.7, and 52. (*Id.* ¶¶ 214–41.)

Defendants move to dismiss the Complaint for insufficient service of process and for failure to state a claim upon which relief can be granted. The Court first addresses the issue of service of process under Rule 12(b)(5). The Court then considers the adequacy of the pleadings under Rule 12(b)(6).

## A. Defendants' Rule 12(b)(5) Motion

A federal court does not have personal jurisdiction over a defendant unless that defendant has been properly served pursuant to Federal Rule of Civil Procedure 4. *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988); *see also Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982). District courts should construe Rule 4 liberally "so long as a party receives sufficient notice of the complaint." *Direct Mail Specialists*, 840 F.2d at 688 (internal quotation marks omitted). Nevertheless, "[n]either actual notice, nor simply naming the person in the caption of the complaint, will subject [a] defendant[] to personal jurisdiction if service was not made in substantial compliance with Rule 4." *Jackson*, 682 F.2d at 1347 (internal citations omitted); *see also Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986).

As indicated above, Rule 4(m) requires a district court to "dismiss the action without prejudice" or "order that service be made within a specified time" where a defendant is not served within 120 days of filing a complaint. Fed. R. Civ. P. 4(m). If the plaintiff shows good cause for the failure, however, "the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). "District courts have broad discretion to extend time for service under Rule 4(m)." *Efaw v. Williams*, 473 F.3d 1038, 1041 (9th Cir. 2007). In determining whether good cause exists, a court should consider: (1) whether the non-served defendant has actual notice of the lawsuit; (2) whether the extension of time will cause the non-served defendant to suffer prejudice; and (3) whether the plaintiff will suffer severe prejudice if the complaint is dismissed. *Boudette v. Barnette*, 923 F.2d 754, 756 (9th Cir. 1991). Good cause requires, at a minimum, a showing of excusable neglect. *Id.* "When considering a motion to dismiss a complaint for untimely service, courts must determine whether good cause for the delay has been shown on a case by case basis." *In re Sheehan*, 253 F.3d 507, 512 (9th Cir. 2001).

Plaintiffs lodged the Complaint and petitioned to proceed *in forma pauperis* on October 3, 2014. (Dkt. No. 1.) The petition was granted and the Complaint was docketed on October 9, 2014. (Dkt. No. 9.) Plaintiffs did not serve the County until February 6, 2015 and did not serve any of the individual defendants until February 9, 2015. (Dkt. Nos. 15–20.) Regardless of whether the Complaint is deemed filed on October 3, 2014 or October 9, 2014, the service was untimely under Rule 4(m). All of the individual defendants have moved to dismiss pursuant to Rule 12(b)(5). Because Rule 4(m) requires that a district court extend the time for service upon a showing of

good cause, *see Lemoge*, 587 F.3d at 1198, the issue is whether Plaintiffs have made the requisite showing.

**1. Ms. Acklin, Mr. Aguilar, Ms. Alfaro, Ms. Espinoza, and Ms. Ward**

Ms. Acklin, Mr. Aguilar, Ms. Alfaro, Ms. Espinoza, and Ms. Ward request that they be dismissed from the instant action due to insufficient service of process. (Mot. to Dismiss at 1.) Plaintiffs concede that these defendants were not timely served but assert that good cause exists to extend the time for service. (Dkt. No. 23 at 2–7.)[2] After reviewing Plaintiffs' response to the Court's order to show cause, the Court finds that good cause does exist with respect to these defendants.

The first factor considers whether the defendants had actual notice of the lawsuit. *See Boudette*, 923 F.2d at 756. Plaintiffs presented a claim for damages with the County on October 3, 2014. (Compl. ¶ 121.) Although Plaintiffs assert that the late-served defendants must have known about the lawsuit because they are currently employed by DCFS, (*see* Dkt. No. 23 at 4), it is not clear they in fact had actual notice. Defendants' motion does not address the matter. This factor is therefore neutral.

The second and third factors consider whether an extension of time will prejudice the defendants, and whether Plaintiffs will be prejudiced by a dismissal. *See Boudette*, 923 F.2d at 756. Because the defendants were in fact served on February 9, 2015, just nine days after the deadline for proper service, it does not appear that they have been prejudiced by the delay. Indeed, they have obtained counsel and filed the instant Motion to Dismiss, which raises various legal arguments seeking dismissal on grounds other than improper service, and which does not assert any actual prejudice resulting from the delay. The second factor therefore favors a finding of good cause. *See Henderson v. United States*, 517 U.S. 654, 661 (1996) ("Reading Rule 4 in its historical context, we conclude that the 120-day provision operates not as an outer limit subject to reduction, but as an irreducible allowance.").

---

[2] Docket Number 23 contains Plaintiffs' response to the Court's order to show cause. Because the response is a publicly filed document, judicial notice of it is proper. *See Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001) (noting that Federal Rule of Evidence 201 permits a court to take judicial notice of public records).

Although Plaintiffs assert they will be prejudiced by a dismissal because the time to file a petition under California Government Code section 946.6 recently expired, it is not clear to the Court that section 946.6 could provide Plaintiffs any relief. Pursuant to section 946.6, a plaintiff who is denied leave to present an untimely claim for damages to a public entity may petition a court for relief from section 945.4, which prohibits suits for money damages against a public entity unless a written claim has been made and either acted upon or deemed rejected. *See* California Gov't Code §§ 945.4, 946.4. The petition must be filed within six months after the application for leave has been denied or deemed rejected. The Complaint alleges that Plaintiffs presented a claim for damages to the County on October 3, 2014. (Compl. ¶ 121.) But the Complaint does not allege that Plaintiffs filed an application for leave. Accordingly, section 946.6 is inapplicable, and the third factor does not favor an extension of time.

Nevertheless, the Court finds that Plaintiffs have demonstrated excusable neglect. Plaintiffs assert that their counsel "made every effort to confirm with multiple County employees that the address for service of the individual Defendants was 201 Centre Plaza Drive, Suite 100, Monterrey [*sic*] Park, California, 91754." (Dkt. No. 23 at 4.) In fact, the proper service address was 425 Shatto Place, 5th Floor, Los Angeles, California, 90020. (*Id.* at 6.) Given that the County did not provide Plaintiffs with the proper service address for DCFS employees, and given that the ultimate delay in service was only nine days, the circumstances indicate that the delay resulted from excusable neglect. Plaintiffs have therefore made the minimum requisite showing of good cause. *See Boudette*, 923 F.2d at 756. Accordingly, the Court will extend the time for service on these defendants and excuse the nine day delay. Defendants' Motion to Dismiss is therefore **DENIED** to the extent it seeks to dismiss Ms. Acklin, Mr. Aguilar, Ms. Alfaro, Ms. Espinoza, and Ms. Ward for insufficient process under Rule 12(b)(5).

### 2. Ms. Adrian

Plaintiffs have not found or served Ms. Adrian. (*See* Dkt. No. 23 at 2.) As with the late-served defendants, Plaintiffs nevertheless assert good cause exists and request that the Court extend the time for service. (*Id.* at 2–7.) Plaintiffs' response indicates that when the process server ultimately served Ms. Acklin, Mr. Aguilar, Ms. Alfaro, Ms. Espinoza, and Ms. Ward, the individual authorized to accept service on their behalf indicated that Ms. Adrian is no longer employed by the County. (*Id.* at 6.) Plaintiffs

maintain that the process server "has begun a skip trace of Lana Adrian in an effort to locate her, and have yet to find her." (*Id.*)

With respect to Ms. Adrian, the Court finds that good cause does not exist to extend the time for service. Because Ms. Adrian is no longer employed by DCFS or the County, there is no basis for concluding she has even constructive notice of this lawsuit, let alone actual notice. She may also suffer prejudice from an extension of time. As she appears to be the only individual defendant no longer employed by DCFS, she may need to secure her own counsel, and her interests have not been represented in the instant Motion to Dismiss. Because Plaintiffs have not clearly articulated how they will suffer prejudice from her dismissal, the relevant factors weigh against a finding of good cause.

The Court also cannot conclude that the failure to locate Ms. Adrian necessarily results from excusable neglect. Plaintiffs learned that Ms. Adrian is no longer employed by the County on February 9, 2015, over two months ago. Although Plaintiffs aver that they have attempted to locate her, they do not detail these efforts beyond explaining that the process server has "begun a skip trace." Accordingly, the Court finds that Plaintiffs have failed to demonstrate good cause to extend the time for service on Ms. Adrian. For the same reasons good cause does not exist, the Court declines to exercise its discretion to extend the time for service. The Court therefore **DISMISSES** Ms. Adrian from this matter **without prejudice**.

### B. Defendants' Rule 12(b)(6) Motion

As set forth above, Plaintiffs bring twelve claims for relief. Defendants challenge all twelve claims on various grounds. The Court will discuss each claim in turn.

#### 1. Plaintiffs' First Through Fifth Claims Under § 1983

Plaintiffs' first through fifth claims arise under 42 U.S.C. § 1983. To establish a prima facie case under § 1983, Plaintiffs must allege facts demonstrating both of the following: "(1) the conduct complained of was engaged in under color of state law, and (2) the conduct subjected the plaintiff to the deprivation of rights, privileges, and immunities secured by the Constitution of the United States." *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976). "Section 1983 does not create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by governmental

officials." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). To be liable under § 1983, an individual must personally participate in the alleged deprivation. *Id.*; *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant.").

Plaintiffs' first through fifth claims allege constitutional violations by the individual defendants.[3] Defendants attack these claims on two primary grounds. First, Defendants argue that Plaintiffs have failed to plead sufficient facts to demonstrate personal involvement or participation by some of the individual defendants. Second, Defendants argue that the individual defendants are entitled to qualified immunity.

Qualified immunity is an affirmative defense that protects government employees from liability for civil damages where the official's conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity analysis involves two inquiries. First, a court must consider whether the plaintiff has established facts that "make out a violation of a constitutional right." *Id.* at 232. The court must also consider "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* District courts have discretion in deciding which prong to address first. *Id.* at 236.

Qualified immunity applies "unless the official's conduct violated a clearly established constitutional right." *Id.* at 232. "This standard protects all but the plainly incompetent or those who knowingly violate the law." *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir. 2002) (internal quotation marks omitted). The Supreme Court has made clear that "the defense is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.'" *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Accordingly, resolution of a claim for qualified immunity is appropriate on a motion to dismiss. *Id.*

[3] To the extent Plaintiffs seek to hold the County liable for the alleged violations, the Court will consider the County's liability in discussing Plaintiffs' sixth claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

**a. Plaintiffs' First and Second Claims: The Fourth Amendment**

Plaintiffs' first and second claims allege that B.U. and L.V. were unlawfully seized and removed from their mother's custody, thereby violating their Fourth Amendment rights. (Compl. 122–32.) The purpose of the Fourth Amendment "is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials" and to "safeguard the privacy and security of individuals against arbitrary invasions." *Del. v. Prouse*, 440 U.S. 648, 653–54 (1979) (internal quotation marks omitted). The Fourth Amendment protects children from removal from their homes absent a showing that the officials had sufficient information to establish reasonable cause to believe that both: (1) the children were in "imminent danger of serious bodily injury," and (2) the scope of the intrusion was "reasonably necessary to avert that specific injury." *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007) (internal quotation marks omitted); *see also Wallis v. Spencer*, 202 F.3d 1126, 1137 n.8 (9th Cir. 1999) (explaining that where children are removed from a parent's custody, they are subjected to a seizure and their claims are properly assessed under the Fourth Amendment).

Defendants assert that B.U. and L.V. have failed to state a claim for a Fourth Amendment violation against Mr. Aguilar and Ms. Ward. (Mot. Dismiss at 12–13.) The Complaint alleges that Ms. Ward was present at the initial team meeting on October 12, 2012, and that she was one of four individuals who informed Ms. Castillo that she would have to attend various classes and complete a drug program before her children could be returned to her. (Compl. ¶¶ 59, 62.) Although the Complaint alleges that Ms. Ward failed to conduct a reasonable investigation or pursue less intrusive means than removal of the children from Ms. Castillo's custody, (*see id.* ¶ 131), the Complaint is clear that Ms. Ward was not directly assigned to Ms. Castillo's case, as were Ms. Acklin and Ms. Espinoza, nor a supervisor of either. There are no further allegations against Ms. Ward.

Mr. Aguilar, who served as Ms. Acklin's supervisor, is also alleged to have been present at the first team meeting. (*Id.* ¶¶ 47, 59.) The Complaint alleges that Mr. Aguilar accused Ms. Castillo of being a drug addict, and that he spoke harshly to Ms. Castillo when she expressed concern over the time it would take for a background check to release the children to a relative's custody. (*Id.* ¶¶ 48, 61.) As Ms. Acklin's supervisor,

Mr. Aguilar allegedly agreed with the decision to remove the children from Ms. Castillo's custody until the cause of Moises' condition was determined. (*Id.* ¶ 32.)

Defendants argue that these allegations are insufficient to state claim for a Fourth Amendment violation against Mr. Aguilar and Ms. Ward. They assert that because neither defendant is alleged to have physically removed B.U. and L.V. from Ms. Castillo's custody, they cannot be found to have violated the children's Fourth Amendment rights. This argument is persuasive with respect to Ms. Ward. Ms. Ward is only alleged to have been present at the October 12, 2012 team meeting, which occurred after the children were taken from Ms. Castillo. No facts or allegations suggest that she participated in any way in the decision to remove the children from Ms. Castillo's care.

This argument is unpersuasive, however, with respect to Mr. Aguilar. The Complaint clearly alleges his direct participation in the decision to remove the children from Ms. Castillo's custody, as Mr. Aguilar is alleged to have approved and even "recommended" the removal. (*Id.* ¶¶ 32, 47.) Thus, even if Mr. Aguilar did not physically seize the children, his alleged approval of the decision to do so is sufficient to demonstrate supervisory liability. *See Taylor*, 880 F.2d at 1045 (explaining that a supervisor may be liable for constitutional violations "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.").

The Court also finds that Mr. Aguilar is not entitled to qualified immunity. At the time of the alleged seizure, it was clearly established that the Fourth Amendment protects children from removal from their homes absent prior judicial authorization or a showing of reasonable cause to believe that the children were in "imminent danger of serious bodily injury" and removal was "reasonably necessary to avert that specific injury." *Rogers*, 487 F.3d at 1294; *see also Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001) (quoting *Wallis*, 202 F.2d at 1138). "The constitutional right of parents and children to live together without governmental interference [was also] well established." *Mabe*, 237 F.3d at 1107.

It is undisputed that the DCFS did not act pursuant to a court order or prior judicial authorization. The relevant inquiry, then, is whether a reasonable social worker could have believed that removing B.U. and L.V. from Ms. Castillo's custody was lawful under the circumstances. *Id.* This inquiry depends on whether a reasonable social worker could

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 14–07702 BRO (VBKx)** | Date | April 17, 2015 |
| Title | **LISA CASTILLO ET AL V. COUNTY OF LOS ANGELES ET AL** | | |

have believed that the children were in imminent danger of serious injury, and that their removal was reasonably necessary to avoid serious injury. *Id.* Reasonable cause must be based upon "specific, articulable evidence." *Wallis*, 202 F.2d at 1138. Further, officials "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed." *Id.* The existence of reasonable cause is generally a question of fact to be determined by a jury. *Id.*

Based on the allegations in the Complaint, it is not clear that a reasonable social worker could have concluded B.U. and L.V. were in imminent danger of serious harm. At the time of the children's removal, the facts known to Ms. Acklin and her supervisor, Mr. Aguilar, were as follows: Ms. Castillo found her infant child, Moises, unresponsive in his crib; Ms. Castillo rushed him to the hospital, where he remained in a coma; the doctors had not yet determined the cause of Moises' condition; the doctors and hospital staff saw no signs of abuse or neglect; and Ms. Castillo had a criminal background related to drugs and was on probation. (Compl. ¶¶ 22–23, 30.) Although the Complaint alleges that Ms. Acklin interviewed B.U., L.V., and other family members, it does not allege what information these interviews revealed. (*Id.* ¶¶ 24–25.) Given that there are no allegations regarding past abuse or neglect by Ms. Castillo, nor reports from B.U., L.V., or other family members of any fear of the same, the decision to remove the children appears to be based solely upon the assumption that Ms. Castillo must have been responsible for Moises' condition, and that she must therefore be an imminent danger to B.U. and L.V. The facts alleged to have been known to Ms. Acklin and Mr. Aguilar do not support these conclusions. Accordingly, the Court cannot find as a matter of law that a reasonable social worker could have concluded the children's immediate removal was necessary. Thus, Mr. Aguilar is not entitled to qualified immunity at this stage of the proceedings. Defendants' Motion to Dismiss the first and second claims is therefore **GRANTED** with respect to Ms. Ward and **DENIED** with respect to Mr. Aguilar.

**b. Plaintiffs' Third Claim: The Sixth Amendment**

Plaintiffs' third claim is brought by Ms. Castillo, B.U., and L.V. for violations of their Sixth Amendment right to counsel. (Compl. ¶¶ 133–38.) According to the Complaint, all Defendants violated the Sixth Amendment by denying the right to have counsel present at the October 12, 2012 team meeting, never setting a court date, and

failing to appoint counsel to protect B.U. and L.V.'s best interests. (*Id.* ¶¶ 135–37.) The Sixth Amendment provides the following:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

*See* U.S. Const., amend. VI.

Defendants seek to dismiss this claim on the basis that the facts and allegations do not demonstrate a Sixth Amendment violation. (Mot. to Dismiss at 14–15.) Indeed, Plaintiffs do not allege that they were subjected to any criminal proceedings. (*See generally* Compl.) Although Plaintiffs assert that child custody proceedings are akin to criminal proceedings, (*see* Opp'n at 11), Plaintiffs provide no authority to support the proposition that they therefore had a Sixth Amendment right to counsel during the events in question.[4] Case law, and indeed the text of the Constitution, clearly establishes that the Sixth Amendment provides no protection in this case because Plaintiffs did not face criminal proceedings. *See United States v. Marion*, 404 U.S. 307, 313 (1971) ("On its face, the protection of the [Sixth] Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution."). Dismissal is therefore appropriate. *See Carlson v. Cnty. of L.A.*, 2014 U.S. Dist. LEXIS 181185, at *36 (C.D. Cal. Dec. 23, 2014) (dismissing the plaintiffs' Sixth Amendment claim in a case challenging conduct by the DCFS because the plaintiffs "were not subject to criminal prosecution and therefore were not entitled to the protections of the Sixth Amendment"). Defendants' Motion to Dismiss Plaintiffs' third claim is therefore **GRANTED**.

[4] The only cases cited by Plaintiffs are *Cleaver v. Wilcox*, 499 F.2d 940 (9th Cir. 1974) (involving statutory right to counsel under California law for indigent parents in child dependency proceedings), and *Santosky v. Kramer*, 455 U.S. 745 (1982) (discussing a parent's due process rights in child dependency proceedings and finding that due process requires a state to support its allegations by clear and convincing evidence before terminating parental rights). Neither of these cases discusses the Sixth Amendment.

### c. Plaintiffs' Fourth and Fifth Claims: The First and Fourteenth Amendments

Plaintiffs' fourth claim alleges that all Defendants violated their First Amendment rights by interfering with their familial relations. (Compl. ¶¶ 139–43.) Their fifth claim alleges Defendants violated their Fourteenth Amendment rights to familial association. (*Id.* ¶¶ 144–52.) Both claims are based upon the allegedly unlawful removal and detention of B.U. and L.V. from Ms. Castillo's care and custody.

"It is well established that a parent has a 'fundamental liberty interest' in 'the companionship and society of his or her child' and that 'the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983.'" *Lee v. City of L.A.*, 250 F.3d 668, 685 (9th Cir.2001) (quoting *Kelson v. City of Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1985)); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing the fundamental liberty interest of parents in the care, custody, and management of their children). This constitutional liberty interest "logically extends to protect children from unwarranted state interference with their relationships with their parents." *Lee*, 250 F.3d at 685. The First Amendment also protects family relationships "that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id.* (internal quotation marks omitted) (citing *Bd. of Dir. v. Rotary Club*, 481 U.S. 537, 545 (1987)).

"While a constitutional liberty interest in the maintenance of the familial relationship exists, this right is not absolute." *Woodrum v. Woodward Cnty., Okla.*, 866 F.2d 1121, 1125 (9th Cir. 1989). A parent's constitutional right to familial association may be circumscribed "[i]n an emergency situation when the children are subject to immediate or apparent danger or harm." *Mueller v. Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012) (alterations omitted). Thus, when a child's safety is threatened, the state may act without notice and a hearing. *Id.*; *see also Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983). The same legal standard applies in evaluating claims for the removal of children under the Fourth Amendment as under the Fourteenth Amendment. *See Wallis*, 202 F.3d at 1137 n.8; *see also Rogers*, 487 F.3d at 1294 (requiring reasonable cause to believe that the children are in imminent danger of serious harm and that removal is reasonably necessary to avoid injury). Although there are no clear standards governing

interference with the right of familial association under the First Amendment, courts have assessed such claims by referencing the standards applicable to other associational freedoms. *See, e.g. Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, 2013 U.S. Dist. LEXIS 136933, at *31 (E.D. Cal. September 23, 2013) (requiring that the interference be justified by "sufficiently important state interests" and "closely tailored to effectuate only those interests" (internal quotation marks omitted)).[5]

Defendants seek to dismiss the First and Fourteenth Amendment claims against the individual defendants on the basis that Plaintiffs have failed to plead sufficient facts to demonstrate constitutional violations. (Mot. to Dismiss at 16–18.) Defendants also assert qualified immunity. (*Id.*) The Court will consider the allegations against each individual defendant separately.[6]

**i. Ms. Alfaro**

The only factual allegations against Ms. Alfaro are that she failed to return Ms. Castillo's telephone calls asking whether the DCFS had received the autopsy report, and that she was present at the second team meeting when DCFS informed Ms. Castillo that her children would be returned to her. (Compl. ¶¶ 91–92, 97–99.) These allegations do not demonstrate Ms. Alfaro's personal involvement in the purported rights deprivations. Accordingly, Defendants fail to state a claim against her for violations of the First or Fourteenth Amendments. *See Jones*, 297 F.3d at 934. Defendants' Motion to Dismiss the fourth and fifth claims is therefore **GRANTED** with respect to Ms. Alfaro.

---

[5] For purposes of this motion, the Court must construe the pleadings in the light most favorable to Plaintiffs. *See Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 787 (9th Cir. 2012). Because the First and Fourteenth Amendments both protect the right to familial association, and because there are no clear standards for assessing Plaintiffs' claims under the First Amendment, the Court finds it appropriate to apply the Fourteenth Amendment standard to Plaintiffs' First Amendment claims. The Court will therefore discuss Plaintiffs' First and Fourteenth Amendment claims simultaneously.

[6] As indicated above, to the extent these claims are brought against the County, the Court will consider them in assessing Plaintiffs' sixth claim under *Monell*.

### ii. Ms. Ward

Ms. Ward is alleged to have been present at and to have participated in the first team meeting where the DCFS workers informed Ms. Castillo that her children would not be returned to her until the autopsy report was returned, the criminal investigation was closed, and she completed a drug program and attended various classes. (Compl. ¶¶ 59, 62.) These allegations are sufficient to demonstrate Ms. Ward's direct participation in the decision keep Ms. Castillo and her children separated for an extended period of time. Defendants maintain that Plaintiffs cannot state a claim for "continued detention" because Ms. Castillo signed a voluntary placement agreement. (*Id.* ¶ 68.) But Plaintiffs allege that Ms. Castillo signed the agreement "[u]nder duress and fear of losing her children forever." (*Id.*) Construing the pleadings in the light most favorable to Plaintiffs, the allegation that she did not act voluntarily is plausible. Plaintiffs have alleged that the DCFS workers would not allow her attorney to be present and repeatedly informed her that "this was the only plan . . . to get B.U. and L.V. back." (*Id.* ¶¶ 59, 66.) Accordingly, Ms. Castillo could have believed that she needed to sign the agreement to preserve her right to obtain custody of her children again.

These allegations are sufficient to establish a violation of Plaintiffs' First and Fourteenth Amendment rights to familial association and to defeat Ms. Ward's claim to qualified immunity at this stage of the proceedings. The facts known to the DCFS workers at the time of the first team meeting were essentially the same as those known to Ms. Acklin and Mr. Aguilar at the time of the initial removal, which the Court has found to preclude Mr. Aguilar's qualified immunity defense. The only additional facts known on October 12, 2012 undercut a showing that the workers had a reasonable fear for the children's imminent safety. The police had searched Ms. Castillo's home and apparently found no evidence of abuse or neglect. (Compl. ¶ 50.) And another doctor had written a letter to DCFS stating that he had no suspicion Moises' death resulted from neglect or abuse and advocating that B.U. and L.V. be returned to their mother. (*Id.* ¶ 56.) Assuming the truth of these allegations, a reasonable social worker could not have reasonably concluded that B.U. and L.V.'s continued removal was reasonably necessary to avert imminent bodily harm. Defendants' Motion to Dismiss Plaintiffs' fourth and fifth claims is therefore **DENIED** with respect to Ms. Ward.

### iii. Ms. Acklin, Mr. Aguilar, and Ms. Espinoza

The facts alleged against Ms. Acklin, Mr. Aguilar, and Ms. Espinoza demonstrate the same or more direct involvement than Ms. Ward in the decision to keep Ms. Castillo separated from her children. For the same reasons the Court finds that Plaintiffs have alleged sufficient facts to establish a violation of their First and Fourteenth Amendment rights and to preclude a qualified immunity defense with respect to Ms. Ward, the Court finds that Plaintiffs have stated claims against Ms. Acklin, Mr. Aguilar, and Ms. Espinoza. Defendants' Motion to Dismiss the fourth and fifth claims is therefore **DENIED** as to these defendants.

### 2. Plaintiffs' Sixth Claim: *Monell* Liability

Plaintiffs seek to hold the County liable for the alleged violations of their First, Fourth, Sixth, and Fourteenth Amendment rights pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). (Compl. ¶¶ 139–85.) Municipalities may be liable for constitutional deprivations only if they result from a governmental custom or policy. *Id.* at 691 ("[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, to state a claim against the County, Plaintiffs must allege facts demonstrating all of the following: (1) they were deprived of a constitutional right; (2) the County had a policy amounting to "deliberate indifference" to this right; and (3) "the policy was the moving force behind the constitutional violation." *Mabe*, 237 F.3d at 1110–11 (internal quotation marks omitted).

As discussed above, Plaintiffs have adequately alleged violations of their First, Fourth, and Fourteenth Amendment rights. Plaintiffs have not alleged violations of their Sixth Amendment rights. Accordingly, to the extent Plaintiffs' sixth claim is predicated upon an alleged policy to deprive the Sixth Amendment right to counsel, Plaintiffs' claim fails and Defendants' Motion to Dismiss is **GRANTED**.

With respect to the three constitutional rights for which Plaintiffs have adequately alleged a violation or violations, the Court must consider whether Plaintiffs have demonstrated that a County policy caused the harm. Before *Twombly* and *Iqbal*, the long-standing rule in the Ninth Circuit was that a plaintiff need only make "a bare

allegation that the individual [defendants'] conduct conformed to official policy, custom, or practice" to withstand a motion to dismiss. *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 624 (9th Cir. 1988) (internal quotation marks omitted). In *Starr v. Baca*, the Ninth Circuit considered the impact of *Iqbal* and *Twombly* and concluded that at least two principles are applicable to all pleading standards:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Since *Starr*, the Ninth Circuit has confirmed that this same standard applies to *Monell* claims. *See AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).

Accordingly, the relevant inquiries center on whether the Complaint contains sufficient factual allegations to give the County fair notice of the claims against it, and whether the allegations are plausible such that it is fair to subject the County to the expense of further litigation. After reviewing the Complaint with these principles in mind, the Court finds that the allegations are sufficient to state claims under the First, Fourth, and Fourteenth Amendments against the County and pursuant to *Monell*. Plaintiffs allege that the County has "the policy of detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent." (Compl. ¶ 154 (a).) Plaintiffs further allege that the County has a "policy of examining children without exigency, need, or proper court order and without the presence of their proper custodian and/or guardian; the policy of removing and detaining children and not returning them, beyond a reasonable period after the basis for detention has been negated." (*Id.* ¶ 154 (d).) These allegations, which are variously phrased and reiterated throughout the Complaint, (*see id.* ¶ 154(a)–(l)), are sufficient to put the County on notice of the claims against it.

Plaintiffs have also pleaded sufficient facts to plausibly suggest an entitlement to relief. To that end, Plaintiffs allege that these policies have resulted in numerous constitutional rights violations and that the incident involving Ms. Castillo and her children "is not an isolated incident." (*Id.* ¶ 157.) To support this allegation, Plaintiffs cite to other cases alleging that the County "has a pattern, practice, and policy of violating the rights of families in dependency actions," (*id.* ¶¶ 159–64), as well as an investigative report into "Recurring Systemic Issues" at the DCFS, (*id.* ¶¶ 168–85).[7]

In sum, the Court finds that Plaintiffs have alleged sufficient facts to place the County on fair notice to defend itself effectively. The allegations also plausibly suggest an entitlement to relief. Accordingly, to the extent Plaintiffs' *Monell* claims against the County are predicated upon alleged violations of the First, Fourth, and Fourteenth Amendment, Defendants' Motion to Dismiss is **DENIED**.

### 3. Plaintiffs' Seventh Claim Under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

Plaintiffs' seventh claim is against the County and arises under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"). (Compl. ¶¶ 186–97.) The Rehabilitation Act prohibits discrimination on the basis of a disability and applies to federally funded programs. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). Section 504 authorizes private rights of action "for individuals subjected to disability discrimination by any program or activity receiving federal financial assistance."

[7] Defendants vigorously assert that these cases and the investigative report are not relevant to state a claim against the County. (Mot. to Dismiss at 20–22.) Because the cases and report are expressly incorporated into the Complaint, the Court may properly consider them on a motion to dismiss. *See Lee*, 250 F.3d at 688 ("[A] court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss."). Moreover, *Monell* makes clear that a governmental custom or policy may exist "even though such custom has not received formal approval through a body's official decisionmaking channels." 436 U.S. at 690–91. Thus, even where a policy is "not authorized by written law," it may be "so permanent and well settled as to constitute a 'custom' or 'usage' with the force of law." *Id.* at 691 (internal quotation marks omitted). Thus, Plaintiffs' reliance on other incidents involving the same conduct as alleged here is not improper; if DCFS workers have acted similarly in other investigations, this may constitute evidence that they did so pursuant to a policy, practice, or custom.

*Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940 (9th Cir. 2009). To establish a violation under § 504, a plaintiff must show all four of the following: (1) the plaintiff is handicapped within the meaning of the Rehabilitation Act; (2) the plaintiff is "otherwise qualified for the benefit or services sought"; (3) the plaintiff "was denied the benefit or services solely by reason of" the handicap; and (4) "the program providing the benefit or services receives federal financial assistance." *Lovell*, 303 F.3d at 1052; *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).

Defendants challenge this claim on the basis that Plaintiffs have failed to plead any facts identifying a qualifying disability. (Mot. to Dismiss at 22.) This failure is fatal to a claim under § 504, as a plaintiff must allege the existence of a disability or handicap to satisfy the first and third elements of a prima facie claim. Plaintiffs' Opposition points out that they have alleged the County and DCFS are recipients of federal funds, and that they were denied the benefit or service of "family maintenance services which include visitation to parents." (Opp'n at 17–18; Compl. ¶¶ 189, 195.) Although these allegations may also be required to state a claim under § 504, they are insufficient alone to establish a prima facie claim. Because Plaintiffs fail to allege any disability or handicap within the meaning of the Rehabilitation Act, and because Plaintiffs do not allege they were denied any benefits or services "solely by reason of" that disability or handicap, Plaintiffs have failed to state a claim under § 504. Accordingly, Defendants' Motion to Dismiss the seventh claim is **GRANTED**.

### 4. Plaintiffs' Eighth Claim for Negligent Supervision, Hiring, Retention, and Discipline

Plaintiffs' eighth claim alleges negligent supervision, hiring, retention, and discipline and is brought against all Defendants. (Compl. ¶¶ 198–206.) Defendants first argue that the Government Tort Claims Act bars this claim. (Mot. to Dismiss at 23.) Defendants also argue that the County and the individual defendants are immune from liability under California law. (*Id.* at 23–26.) As set forth in more detail below, the Court finds that the Complaint fails to allege compliance or an excuse for noncompliance with the Government Tort Claims Act. The Court also finds that Defendants are entitled to immunity under California law. Dismissal is appropriate on either basis.

### a. Government Tort Claims Act

The Government Tort Claims Act "establishes certain conditions precedent to the filing of a lawsuit against a public entity." *State v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1237 (Cal. 2004). Section 945.4 of the California Government Code provides that:

> [N]o suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board.

Cal. Gov't Code § 954.4. Claims involving injury to one's person or property must be presented no later than six months after the claim's accrual. *Id.* § 911.2. In considering the timeliness of any presentation, a claim accrues on the same day it "would be deemed to have accrued within the meaning of the statute of limitations which would be applicable thereto if there were no requirement that a claim be presented to and be acted upon by the public entity." *Id.* § 901. In short, the claim must be presented no later than six months after "the wrongful act is done and the liability or obligation arises." *Mosesian v. Cnty. of Fresno*, 28 Cal. App. 3d 493, 500 (Cal. Ct. App. 1972).

If a plaintiff fails to timely present a claim, the plaintiff may apply to the public entity for leave, but the application must be filed within a reasonable time not to exceed one year of the claim's accrual. Cal. Gov't Code § 911.4(a)–(b). In determining the time to file an application for leave, "time during which the person who sustained the alleged injury, damage, or loss as a minor shall be counted." *Id.* § 911.4(c)(1). Section 950.2 similarly provides that the failure to timely present a claim bars a cause of action against a public employee "for injury resulting from an act or omission in the scope of his employment." *Id.* § 950.2.

Plaintiffs' eighth claim seeks money damages from a public entity and public employees. (Compl. ¶¶ 205–06.) Section 954.4's presentation requirement applies to this claim.[8] To state a claim against Defendants for negligent supervision, hiring,

[8] Section 905 exempts various claims from the presentation requirement. *See* Cal. Gov't Code § 905. Plaintiffs' eighth claim does not fall within any recognized exemption.

retention, and discipline, Plaintiffs must therefore affirmatively allege compliance with section 954.4's presentation requirement. *See Bodde*, 32 Cal. 4th at 1243 ("[A] plaintiff must allege facts demonstrating or excusing compliance with the claim presentation requirement. Otherwise, his complaint is subject to a general demurrer for failure to state facts sufficient to constitute a cause of action.").

Here, the Complaint alleges only that Plaintiffs presented a claim for damages to the County on October 3, 2014. (Compl. ¶ 121.) By any calculation, this presentation was untimely. B.U. and L.V. were removed from Ms. Castillo's custody on October 4, 2012. (*Id.* ¶ 37.) Thus, Plaintiffs were required to present a claim by no later than April 4, 2013. Alternatively, Plaintiffs were required to apply for leave by no later than October 4, 2013.

In their Opposition, Plaintiffs argue that Defendants have waived the untimely claims presentation defense because the County's response to Plaintiffs' October 3, 2014 claim was defective. (*See* Opp'n at 18–19.) Plaintiffs also argue that the County should have granted Plaintiffs leave to file a late claim. (*Id.* at 19–20.) These arguments are unavailing, however, because they are based upon facts and circumstances not alleged in the Complaint.[9] As stated above, Plaintiffs must allege facts demonstrating compliance or an excuse for noncompliance with the presentation requirement. Based upon the Complaint's limited allegations regarding the presentation requirement, the Court cannot find either. Accordingly, the Government Tort Claims Act bars Plaintiffs' eighth claim.

**b. Public Employee Immunity Under California Law**

California law vests public employees with immunity from state tort claims like Plaintiffs' eighth claim for negligent supervision, hiring, retention, and discipline. To that end, California law provides the following: "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2. In interpreting this

[9] "In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

statute, California state courts have concluded that "[t]he immunity applies even to 'lousy' decisions in which the worker abuses his or her discretion, including decisions based on 'woefully inadequate information.'" *Christina C. v. Cnty. of Orange*, 220 Cal. App. 4th 1371, 1381 (Cal. Ct. App. 2013) (quoting *Ortega v. Sacramento Cnty. Dep't of Health & Human Servs.*, 161 Cal. App. 4th 713, 725, 728, 733 (Cal. Ct. App. 2008) (finding immunity where a social worker failed to make a "considered decision balancing risks and advantages" and returned a child to the father, who stabbed the child in the heart and lungs four days later)). California courts routinely apply this statutory immunity to social workers involved in removal and placement decisions. *See id.* ("Under this provision, social workers are entitled to immunity for their child removal and placement decisions in dependency proceedings."); *see also Jacqueline T. v. Alameda Cnty. Child Protective Servs.*, 155 Cal. App. 4th 456, 464 (Cal. Ct. App. 2007).

With respect to the individual defendants in this case, the allegations in Plaintiffs' eighth claim relate solely to the decision to remove B.U. and L.V. from Ms. Castillo's custody until the autopsy report had cleared, the criminal investigation had concluded, and Ms. Castillo had completed various classes and a drug program. These defendants are entitled to immunity under section 820.2 because the decision to remove the children from Ms. Castillo's custody was discretionary, and because the immunity applies even if the individual defendants acted unreasonably in exercising their discretion. Accordingly, section 820.2 bars Plaintiffs' eighth claim.

Plaintiffs' Opposition cites to Government Code section 820.21, which provides the following:

> Notwithstanding any other provision of the law, the civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct investigations or proceedings pursuant to Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code shall not extend to any of the following, if committed with malice:(1) Perjury. (2) Fabrication of evidence. (3) Failure to disclose known exculpatory evidence. (4) Obtaining testimony by duress.

Cal. Gov't Code § 820.21. Plaintiffs argue that section 820.21 precludes immunity under section 820.2 because the individual defendants fabricated evidence, failed to disclose exculpatory evidence, and obtained testimony by duress in the investigation and proceedings. Although the Complaint includes conclusions to this effect, (*see* Compl. ¶¶ 150, 152, 217, 228, 235–36), the allegations are boilerplate assertions and are not accompanied by any facts plausibly demonstrating that the individual defendants acted in a manner to disqualify them from immunity under section 820.2. Accordingly, Defendants' Motion to Dismiss Plaintiffs' eighth claim is **GRANTED** with respect to Ms. Acklin, Mr. Aguilar, Ms. Alfaro, Ms. Espinoza, and Ms. Ward.

#### c. Public Entity Immunity Under California Law

Plaintiffs allege that the County "is vicariously responsible for the conduct of its respective employees." (Compl. ¶ 204.) Government Code section 815.2 provides the following: "[e]xcept as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." *See* Cal. Gov't Code § 815.2(b). As discussed above, Ms. Acklin, Mr. Aguilar, Ms. Alfaro, Ms. Espinoza, and Ms. Ward are entitled immunity under section 820.2 on Plaintiffs' eighth claim. The County is therefore entitled immunity under section 815.2, and Defendants' Motion to Dismiss the eighth claim is **GRANTED** with respect to the County**.**

### 5. Plaintiffs' Ninth Claim for Intentional Infliction of Emotional Distress

Plaintiffs' ninth claim is for intentional infliction of emotional distress. (Compl. ¶¶ 207–13.) As with the eighth claim for negligent supervision, hiring, retention, and discipline, the ninth claim arises from the individual defendants' conduct in removing B.U. and L.V. from Ms. Castillo's custody. Because this decision involved a discretionary function, the individual defendants are entitled to immunity under section 820.2, and the County is therefore entitled to immunity under section 815.2. Dismissal is appropriate on this basis. Dismissal is also appropriate based upon Plaintiffs' failure to allege facts demonstrating compliance or an excuse for noncompliance with the

Government Tort Claims Act. Defendants' Motion to Dismiss Plaintiffs' ninth claim is therefore **GRANTED**.[10]

### 6. Plaintiffs' Tenth Through Twelfth Claims for Violations of State Civil Rights

Plaintiffs' tenth through twelfth claims are for violations of their state civil rights pursuant to California Civil Code sections 43, 52.1, 51.7 and 52. (Compl. ¶¶ 214–40.) Because these claims relate solely to the custodial decision at the heart of this case, Defendants are immune under sections 820.2 and 815.2. Plaintiffs' deficient allegations regarding compliance with the Government Tort Claims Act also bar these claims. *See Burdett v. Reynoso,* 2007 U.S. Dist. LEXIS 64871, 87 (N.D. Cal. Aug. 23, 2007) ("Where a public employee is alleged to have violated the Bane Act for acts in the scope of employment, a plaintiff must file a claim under the Government Tort Claims Act before initiating a lawsuit."). Defendants' Motion to Dismiss Plaintiffs' tenth through twelfth claims is accordingly **GRANTED**.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5) is **GRANTED** as to Ms. Adrian, who is **DISMISSED without prejudice**. The motion is **DENIED** as to the late-served defendants.

Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is adjudicated as follows:

(1) As to Plaintiffs' first and second claims, the motion **GRANTED** with respect to Ms. Ward and **DENIED** with respect to Mr. Aguilar.

(2) As to Plaintiffs' third claim, the motion is **GRANTED** with respect to all Defendants.

[10] Plaintiffs' Opposition discusses negligent infliction of emotional distress. (*See* Opp'n at 16–17.) Regardless of whether Plaintiffs allege negligent or intentional infliction of emotional distress, the Court's conclusion would be the same.

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 14–07702 BRO (VBKx)** | Date | April 17, 2015 |
| Title | **LISA CASTILLO ET AL V. COUNTY OF LOS ANGELES ET AL** | | |

(3) As to Plaintiffs' fourth and fifth claims, the motion is **GRANTED** with respect to Ms. Alfaro and **DENIED** with respect to Ms. Acklin, Mr. Aguilar, Ms. Espinoza, and Ms. Ward.

(4) As to Plaintiffs' sixth claim, the motion is **GRANTED** to the extent Plaintiffs allege the County's liability for violating their Sixth Amendment rights and **DENIED** to the extent Plaintiffs allege the County's liability for violating their First, Fourth, and Fourteenth Amendment rights.

(5) As to Plaintiffs' seventh through twelfth claims, the motion is **GRANTED** with respect to all Defendants.

The Court grants Plaintiffs leave to amend. Plaintiffs shall file an amended complaint, if any, by no later than Monday, May 4, 2015.

**IT IS SO ORDERED.**

| | |
|---|---|
| | : |
| Initials of Preparer | rf |